# DOCUMENT 5

# CATHY J. POTTER
# ATTORNEY AT LAW

409 EAST JACKSON AVENUE, HARLINGEN, TEXAS 78550
TEL: (956) 622-3011  •  FAX: (956) 622-3017  •  cpotter@cathypotterlaw.com

**** **FAX COVER 13  page(s) including cover** ****

***URGENT***

April 7, 2020

*OFF.RD+*
*2503*

**TO:**          **Deportation Officer Leal**
              **US DHS / ICE Port Isabel Detention Center**

              **FAX:  (956) 547-1812**


**FROM:**      **Cathy J. Potter**

              **FAX:  (956) 622-3017**

**RE:**          **Release/Parole of Steven Tendo (Uganda) A~~201-529-012~~**

Officer Leal:

I believe you are on this case... but if not, could you please pass it to the officer who is in charge.

A completed and signed G-28, Notice of Entry of Appearance as Attorney, is attached.

Steven Tendo is a citizen of Uganda, detained at Port Isabel Detention Center.  He suffers from diabetes, which is not being properly treated.  He is going blind, and his overall condition is deteriorating too quickly.  An attached letter from Dr. Lasclo Madaras, the Chief Medical Officer for Migrant Clinicians Network (MCN), indicating he has reviewed Mr. Tendo's medical records including the ongoing treatment, fully outlines Mr. Tendo's very serious condition and likely outcome if there is no change.

Mr. Tendo's case was denied by an Immigration Judge, and immediately appealed.  The case is currently on a Petition for Review to the Fifth Circuit, with a motion to reopen pending at the Board of Immigration Appeals, based on a brutal attack on his sister that occurred on December 25, 2019, because the government thugs thought Mr. Tendo had been deported to Uganda, and that his sister

$1$ of $13$

was hiding him. This is more fully presented in the attached letter from Lisa Brodyaga, the attorney who is working on his case at the Board and at the Fifth Circuit.

If he is not released so he is able to get the proper care (including a diet suitable for a diabetic), he may very well go blind, and/or die before his case is satisfactorily concluded. In addition, in view of the COVID-19 pandemic, Mr. Tendo is unquestionably a person who is very vulnerable, a vulnerability increased 100 fold by being in a detained situation without the possibility of effective isolation and treatment if he is infected.

Jennifer Harbury has stepped up to sponsor Mr. Tendo, to provide a place for him to stay and to assist him in getting medical care. She also undertakes to see that he gets to any and all ICE hearings or appearances. Finally, she is ready at any time to come and pick up Mr. Tendo to transport him to her home.

We respectfully ask that you consider the situation carefully, and parole Mr. Tendo as soon as possible. I cannot emphasize enough how serious Mr. Tendo's case is. If you have any questions or need further information, please do not hesitate to contact me at (956) 622-3011 or on my cell phone at (956) 245-4212.

Thank you for your attention and consideration,

Cathy J. Potter



## Notice of Entry of Appearance
## as Attorney or Accredited Representative

Department of Homeland Security

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

### Part 1. Information About Attorney or Accredited Representative

1. USCIS Online Account Number (if any)

   ▶ [                    ]

#### Name of Attorney or Accredited Representative

2.a. Family Name (Last Name)  POTTER

2.b. Given Name (First Name)  CATHY

2.c. Middle Name  JEAN

#### Address of Attorney or Accredited Representative

3.a. Street Number and Name  409 EAST JACKSON AVENUE

3.b. ☐ Apt. ☐ Ste. ☐ Flr. [        ]

3.c. City or Town  HARLINGEN

3.d. State  TX   3.e. ZIP Code  78550

3.f. Province  [        ]

3.g. Postal Code  [        ]

3.h. Country  USA

#### Contact Information of Attorney or Accredited Representative

4. Daytime Telephone Number
   9566223011

5. Mobile Telephone Number (if any)
   9562454550

6. Email Address (if any)
   CPOTTER@CATHYPOTTERLAW.COM

7. Fax Number (if any)
   9566223017

---

### Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

   Licensing Authority

   PENNSYLVANIA

1.b. Bar Number (if applicable)

   210071

1.c. I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

1.d. Name of Law Firm or Organization (if applicable)

   LAW FIRM OF CATHY J POTTER PLL

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

2.b. Name of Recognized Organization

   [        ]

2.c. Date of Accreditation (mm/dd/yyyy)

   [        ]

3. ☐ I am associated with

   [        ],

   the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

4.b. Name of Law Student or Law Graduate

   [        ]

---

Form G-28   09/17/18

300/3

Page 1 of 4

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

This appearance relates to immigration matters before (select **only one** box):

**1.a.** ☐ U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

**2.a.** ☐ U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

**3.a.** ☐ U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)
▶

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):
☐ Applicant   ☐ Petitioner   ☐ Requestor
☐ Beneficiary/Derivative   ☐ Respondent (ICE, CBP)

### Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)

**6.a.** Family Name (Last Name) | TENDO

**6.b.** Given Name (First Name) | STEVEN

**6.c.** Middle Name

**7.a.** Name of Entity (if applicable)

**7.b.** Title of Authorized Signatory for Entity (if applicable)

**8.** Client's USCIS Online Account Number (if any)
▶

**9.** Client's Alien Registration Number (A-Number) (if any)
▶ A- 0 1 5 4 0 0 1

### Client's Contact Information

**10.** Daytime Telephone Number

**11.** Mobile Telephone Number (if any)

**12.** Email Address (if any)

### Mailing Address of Client

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name | 27991 BUENA VISTA BLVD

**13.b.** ☐ Apt.  ☐ Ste.  ☐ Flr.

**13.c.** City or Town | LOS FRESNOS

**13.d.** State | TX   **13.e.** ZIP Code | 78566

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country | USA

## Part 4. Client's Consent to Representation and Signature

### Consent to Representation and Release of Information

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

## Part 4. Client's Consent to Representation and Signature (continued)

### Options Regarding Receipt of USCIS Notices and Documents

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** ☒ I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

**1.b.** ☒ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

   **NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### Signature of Client or Authorized Signatory for an Entity

**2.a.** Signature of Client or Authorized Signatory for an Entity

➡ _[signature]_

**2.b.** Date of Signature (mm/dd/yyyy)  04/06/2020

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1.a.** Signature of Attorney or Accredited Representative

_[signature] Cathy J. Potter_

**1.b.** Date of Signature (mm/dd/yyyy)  09/06/2020

**2.a.** Signature of Law Student or Law Graduate

**2.b.** Date of Signature (mm/dd/yyyy)

508 13

## Part 6.  Additional Information

If you need extra space to provide any additional information within this form, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper.  Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a** Family Name
(Last Name)  TENDO

**1.b** Given Name
(First Name)  STEVEN

**1.c** Middle Name

**2.a** Page Number  **2.b** Part Number  **2.c** Item Number

**2.d**

**3.a** Page Number  **3.b** Part Number  **3.c** Item Number

**3.d**

**4.a** Page Number  **4.b** Part Number  **4.c** Item Number

**4.d**

**5.a** Page Number  **5.b** Part Number  **5.c** Item Number

**5.d**

**6.a** Page Number  **6.b** Part Number  **6.c** Item Number

**6.d**

# Medical Review
# for Immigrants

**Migrant Clinicians Network Initiative**

MRI@migrantclinician.org

512 - 579 – 4504

April 5, 2020

Re: Steven Tendo

Texas RioGrande Legal Aid
4920 I-35, Austin,Tx 78751

To Whom It May Concern,

My name is Dr. Laszlo Madaras, I am a family physician treating diabetic patients among others and practicing in Chambersburg, Pennsylvania since 1996. I graduated from Tufts School of Medicine in 1993 and completed my residency at Brown University Pawtucket Memorial Hospital in 1996. I am a hospitalist Board Certified in Family Medicine. I am also the Chief Medical Officer for Migrant Clinicians Network (MCN), an organization of 35 years working with migrants, refugees and the mobile poor often globally displaced by political or climate change. I have published articles on the special medical needs of migrants in the United States, including in the New England Journal of Medicine.  None of the following opinions are the opinions of my current institution or affiliations but are my own.

I am writing regarding Steven Tendo, a 35-year-old man confined at Port Isabel Detention Center located in Los Fresnos, Texas, with serious medical issues, the most concerning of which is uncontrolled diabetes. He is not my patient, nor have I had the opportunity to interview him directly or conduct a physical exam, I have, however, reviewed the available medical records.

708/3

Mr. Tendo had recorded blood glucose levels of 478 and 577 on subsequent visits to his health clinic in March 2020. He was treated with insulin, had documented a slight drop in glucose levels closer to normal, then sent back to detention. What brought him to the health center at various times are documented as follows:

- *dizziness*
- *blurred vision in the right eye*
- *right sided numbness preceded by reported left sided numbness the day before.*

He correctly attributed these symptoms to his diabetes. These are known symptoms of poorly controlled diabetes, which could easily lead to stroke and heart attack.

His most recent January 7, 2020 HbA1C (a blood test that calculates the diabetic control over the past 3 months) was encouragingly good at 7.0, preceded by one in October 2019 of 6.9. The trend, however, is rising (worsening) and another HbA1C was planned for April 2020, which I suspect will be even higher.

He is only taking one medication for diabetes - metformin, which is an insufficient single medication in his case if, while taking it correctly, his blood glucose is over 500. The physicians who treated him in the urgent care center with insulin were providing the correct medication, but not with the right dose or frequency or duration.

Given this information, I can state that the medical records reveal he needs further specialist care regarding his eyesight, skin lesions, hyperlipidemia, and most importantly, his poorly controlled diabetes. His risks over time are very high for diabetic retinopathy (development of vision problems), diabetic neuropathy (loss of nerve function and feeling in his feet and hands), and diabetic nephropathy (kidney failure leading to dialysis). All of this could lead to further morbidity possibly making it difficult for him to function or earn a living. He should have a complete medical evaluation of his eyes, optimization of his medications to control diabetes, since the treatment provided could save him from an early death.

Additionally, poorly controlled diabetes is a type of immunocompromised condition recognized epidemiologically as a risk factor for infection, including **COVID-19**, which attacks the more vulnerable in our population.

These are all good reasons why I feel Mr. Tendo should be released into the care of specialists who could minimize his medical risks both to himself and to his community.

Thank you for your attention to this matter.

**Laszlo Madaras, MD, MPH, SFHM**
Chief Medical Officer, Migrant Clinicians Network
WellSpan Summit Hospitalist
Medical Director of Educational Affairs, WellSpan Summit Health Campus
Pennsylvania Dept of Health Tuberculosis Control
Clinical Assistant Professor of Medicine, Penn State College of Medicine
Adjunct Assistant Professor of Family Medicine, Brown University
lmadaras@migrantclinician.org

**LAW OFFICES OF LISA S. BRODYAGA**
17891 Landrum Park Rd.
San Benito, Texas 78586
(956) 421-3226
April 5, 2020

Re: Steven Tendo
A201 520 012

To Whom It May Concern

This will confirm that I am representing Mr. Tendo in his petition for review to the Fifth Circuit, of the Decision of the Board of Immigration Appeals, dated December 12, 2019.

His opening brief is due April 8, 2020, and I am better than half finished. In my opinion, he has an exceptionally strong case, for the following reasons.

First, the Immigration Judge denied asylum *solely* because he claimed that he did not believe Mr. Tendo's story, and notwithstanding reams of corroborating evidence. And the reasons he gave were minor discrepancies that had nothing to do with the merits of Mr. Tendo's claim. Second, he did not cite demeanor as one of the reasons he did not believe Mr. Tendo. This means that his determination is not entitled to "deference," but is adjudicated in the same manner as any other factual finding.

Third, the motion to reopen to the Board of Immigration Appeals, which was filed December 31, 2019, is still pending. It is based on the brutal attack on his twin sister which occurred on December 25, 2019, by government thugs who believed that he had been sent back to Uganda, and that his sister was hiding him. There is a mountain of evidence supporting her claim, including color photos of her at the clinic, a letter from the clinic, and a photo of its front (to show that it exists), plus a photo of her smashed phone, and affidavits from her and from a distant relative who works for the government, and who learned by chance, of the procedure that would be followed if he were removed. In short, he would be handed over to the security forces at the airport, and given all the evidence showing their intent to kill him, he would never emerge alive.

Because we filed the motion to reopen so quickly, it is included in the Certified Administrative Record. And although it is not part of the record leading to the BIA order, it is a proper subject of judicial notice, under Rule 201, Federal Rules of Evidence. This rule states that the Court *must* take judicial notice if provided with materials that are not subject to reasonable dispute, and a request is made for judicial notice. We are making that request, and the materials are already in their hands.

Once our brief is filed, the Government has thirty days to respond, which may be extended, and once it is filed, we have the opportunity to file a reply. It then takes many months before a decision would be issued. Further, if the BIA grants the motion to reopen, the petition for review is mooted. And if it is denied, a second petition for review would follow. If the first petition is still pending, the two cases will be consolidated. So there is no chance that the case will be resolved any time soon.

It is also my understanding that his medical situation has deteriorated. It therefore sincerely hope that he can be released on medical parole as soon as possible.

Thank you for your prompt consideration.

Sincerely,

Lisa S. Brodyaga, Attorney

1108 13

April 6, 2020

1020 S. Missouri Ave

Weslaco, Texas 78596

Tel. 512-751-5852, email jharbury@gmail.com


To: Department of Homeland Security Officers

Re:  Sponsorship of Steven Tendo A. 201-520-012


Dear  Officers,


I am writing to confirm my offer of sponsorship to Steven Tendo. He is a citizen of Uganda, born Nov. 4, 1984. He is applying for asylum and is now detained at the Port Isabel Detention Center in Los Fresnos, Texas. His A number is 201-520-012.

I am a citizen of the United States, born Oct. 27, 1951, and I reside at 1020 S. Missouri Ave., Weslaco, Texas 78596. Tel. 512-751-5852.

I am a retired attorney and own my home and car.  I can comfortably take in Mr. Tendo. The house has two bedrooms, and there is plenty of room for him. I am offering him full room and board and reasonable living expenses, such as transportation. I will see that he has transportation to and from all ICE hearings or appearances.

I have numerous ties with the immigrant assistance network in the Rio Grande Valley, so he will have ample access to a variety of support, educational, and transition services. He is already fluent in English and extremely well educated. His attorney is located in the RGV as well.


Sincerely,

Jennifer K. Harbury

12-A-13





130813

# DOCUMENT 6

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
27991 Buena Vista Blvd
Los Fresnos, Texas 78566

 **U.S. Immigration
and Customs
Enforcement**

April 15, 2020

Cathy J. Potter Attorney at Law
409 East Jackson Avenue
Harlingen, Texas 78550

RE:  Request Parole/Release Rquest for TENDO, Steven, A# 201 520 012

Dear Ms. Potter,

The San Antonio Field Office, Enforcement and Removal Operations, received the request for Parole or Release filed on behalf of your client.

I have carefully reviewed your client's immigration file, your letter, and all supporting documentations submitted. I thoroughly considered all relevant factors in reaching a decision for Parole or Release, including, but not limited to your client's immigration history, and humanitarian concerns.

Based upon the documentation and evidence reviewed, your request for Parole/Release is hereby denied.

Sincerely,

Mellissa De Leon
Assistant Officer in Charge
Port Isabel Detention Center
Los Fresnos, Texas 78566

**DOCUMENT 7**

# Medical Review
# for Immigrants

**Migrant Clinicians Network Initiative**

MRI@migrantclinician.org

512 - 579 – 4504

April 5, 2020

Re: Steven Tendo

Texas RioGrande Legal Aid
4920 I-35, Austin,Tx 78751

To Whom It May Concern,

My name is Dr. Laszlo Madaras, I am a family physician treating diabetic patients among others and practicing in Chambersburg, Pennsylvania since 1996. I graduated from Tufts School of Medicine in 1993 and completed my residency at Brown University Pawtucket Memorial Hospital in 1996. I am a hospitalist Board Certified in Family Medicine. I am also the Chief Medical Officer for Migrant Clinicians Network (MCN), an organization of 35 years working with migrants, refugees and the mobile poor often globally displaced by political or climate change. I have published articles on the special medical needs of migrants in the United States, including in the New England Journal of Medicine.  None of the following opinions are the opinions of my current institution or affiliations but are my own.

I am writing regarding Steven Tendo, a 35-year-old man confined at Port Isabel Detention Center located in Los Fresnos, Texas, with serious medical issues, the most concerning of which is uncontrolled diabetes. He is not my patient, nor have I had the opportunity to interview him directly or conduct a physical exam, I have, however, reviewed the available medical records.

Mr. Tendo had recorded blood glucose levels of 478 and 577 on subsequent visits to his health clinic in March 2020. He was treated with insulin, had documented a slight drop in glucose levels closer to normal, then sent back to detention. What brought him to the health center at various times are documented as follows:

- *dizziness*
- *blurred vision in the right eye*
- *right sided numbness preceded by reported left sided numbness the day before.*

He correctly attributed these symptoms to his diabetes. These are known symptoms of poorly controlled diabetes, which could easily lead to stroke and heart attack.

His most recent January 7, 2020 HbA1C (a blood test that calculates the diabetic control over the past 3 months) was encouragingly good at 7.0, preceded by one in October 2019 of 6.9. The trend, however, is rising (worsening) and another HbA1C was planned for April 2020, which I suspect will be even higher.

He is only taking one medication for diabetes - metformin, which is an insufficient single medication in his case if, while taking it correctly, his blood glucose is over 500. The physicians who treated him in the urgent care center with insulin were providing the correct medication, but not with the right dose or frequency or duration.

Given this information, I can state that the medical records reveal he needs further specialist care regarding his eyesight, skin lesions, hyperlipidemia, and most importantly, his poorly controlled diabetes. His risks over time are very high for diabetic retinopathy (development of vision problems), diabetic neuropathy (loss of nerve function and feeling in his feet and hands), and diabetic nephropathy (kidney failure leading to dialysis). All of this could lead to further morbidity possibly making it difficult for him to function or earn a living. He should have a complete medical evaluation of his eyes, optimization of his medications to control diabetes, since the treatment provided could save him from an early death.

Additionally, poorly controlled diabetes is a type of immunocompromised condition recognized epidemiologically as a risk factor for infection, including **COVID-19**, which attacks the more vulnerable in our population.

These are all good reasons why I feel Mr. Tendo should be released into the care of specialists who could minimize his medical risks both to himself and to his community.

Thank you for your attention to this matter.

**Laszlo Madaras, MD, MPH, SFHM**
Chief Medical Officer, Migrant Clinicians Network
WellSpan Summit Hospitalist
Medical Director of Educational Affairs, WellSpan Summit Health Campus
Pennsylvania Dept of Health Tuberculosis Control
Clinical Assistant Professor of Medicine, Penn State College of Medicine
Adjunct Assistant Professor of Family Medicine, Brown University
lmadaras@migrantclinician.org

**DOCUMENT 8**

AFFIDAVIT OF JENNIFER HARBURY

RE STEVEN TENDO MESSAGES RE HEALTH EMERGENCY

My name is Jennifer K. Harbury, I am a U.S .citizen, 68 years old, and of sound mind. I swear that the following is true and correct:

1. I have known Steven Tendo, a refugee from Uganda, dob Nov. 24, 1984, since late 2018.
2. Mr. Tendo is now detained at the Port Isabel Detention Center in Los Fresnos, Texas. His A number is 201-520-012.
3. We have been in frequent contact through visits, telephone calls, and Getting Out messages, which are the limited email services provided to detainees at that facility.
4. I am attaching certain messages I have received from Steven Tendo in 2020 through GettingOut regarding his health condition and the medical treatment, or denial thereof, provided to him.
5. I used the cut and paste method of electronically copying the messages on Getting out, and "pasting" them into a word document. This document, entitled "MESSAGES FROM STEVEN TENDO RE HEALTH EMERGENCY" is attached to this affidavit.
6. I swear that the messages have been correctly and completely copied into the attachment, without any alterations or omissions.

Pursuant to 28 U.S.C. 1746 I swear under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

_Jennifer K. Harbury_

Jennifer K. Harbury

_April 17 2020_

April 17, 2020

MESSAGES FROM STEVEN TENDO RE HEALTH EMERGENCY



**From:** Steven Tendo
**Subject:**

Good evening Jennifer, they have not yet confirmed any appointment with me but I think they are working on it. hope it will be soon and urgent as per the surgeon's recommendations. thanks for asking please. Have a good evening.

**MAR.**
**05**
**17:11**

**From:** Steven Tendo
**Subject:**

am very ill with my sugar levels too high and numb my entire right side with my eye paining a lot.

**MAR.**
**24**
**16:55**

**From:** Steven Tendo
**Subject:**

I have got no update on that please, the last time I met my doctor, she said they had denied my surgery but she would intervene to tell them how important it is that they should do it. its totally dim now and paining but no one seem to care.

**MAR.**
**24**
**18:27**

**From:** Steven Tendo
**Subject:**

I have been admitted in medical for more than two hours, I have just come back to my dorm, my sugar levels are consistently high, its now RBS 480+ and I went when I am numb and very weak, yesterday the nurse told me that with that level of yesterday which was RBS 577,I was lucky not to get into coma after explaining what I was feeling. I dont know what to do but I feel so bad...thanks Jennifer for the care and support.

**MAR.**
**24**
**18:31**

**From:** Steven Tendo
**Subject:**

it was at 194, and they added me insulin, so its now the eye and boils that keep on and off that have posed a big challenge now. I am still praying and strongly believing in God for a miracle release. have a nice day.

**MAR.**
**27**
**08:11**

**From:** Steven Tendo
**Subject:**

no please! we have no soap, no masks and some guard have masks others don't care about masks or gloves.

**APR.**
**08**
**18:26**

**From:** Steven Tendo
**Subject:**

we have ever gotten only one small box in our pod after our hunger strike and when it got finished, that marked the end of it all, even soap we have never gotten any, unless if its privately bought from commissary, never received any sanitizers etc

**APR.**

**09**
**12:03**

**From:** Steven Tendo
**Subject:**

late last week and this whole week there has literally not been any of the masks

**APR.**
**09**
**12:00**



**From:** Jennifer Harbury
**Subject:** No Subject

Steven...so far they are refusing to release you but cathy potter us working on a legal petition for you. Please put her on your getting out.

**APR.**
**09**
**13:35**

**From:** Steven Tendo
**Subject:**

oh my God! I am wondering why they would refuse to let me go. it seems they want me dead.

**APR.**
**09**
**14:20**

**From:** Steven Tendo
**Subject:**

**APR.**
**10**
**09:50**

my eye was paining a lot and my sugar levels high and I was a little numb so I insisted that I wanted to see the doctor, she confirmed that I am serious ill and they are also confused on what to do as my A's of the three months check up jumped from normal which is 7.2 to almost double at 12. 11, she told me that she is stopping pills and resorting to only insulin to stabilise my sugars since I am not responding to pills any more.

**From:** Steven Tendo
**Subject:**

I told her that the insulin makes me hungry all the time which makes me yearn for food all the time that I don't have and requested for a kosher diet but she said I truly need it but not sure whether they will approve it since I have been here long enough i cant ask to change the diet.

**APR.**
**10**
**09:52**

**From:** Steven Tendo
**Subject:**

she is wondering why ICE does not release me in my condition that is worsening under the current threat of the virus, I am most vulnerable.

**APR.**
**10**
**09:53**

**From:** Steven Tendo
**Subject:**

Good morning Jennifer, Am going back for medical eye exam in harlingen today and now. have a blessed day.

**APR.**
**15**
**05:46**

**From:** Steven Tendo
**Subject:**

yes, I am back but the cataract has eaten the most part of the eye that's why I can not see, so they have given me an appointment for may 19, 2020 to meet the surgeon since they could do nothing now due to corona virus restrictions.

**APR.**
**15**
**14:43**

**From:** Steven Tendo

**Subject:** OK please, am still frustrated with my sugar levels instability, if these people had checked me regularly as I had requested from the beginning I would have saved my eye but they intentionally refused and decided to check me once in three months so my sugar levels rose since January and did not know until march when I almost went into comma. the hot boils were all indicators of worsening sugar levels but medical neglected and segregated against me, I wrote grievances asking for the right diet all was neglected and to make matters worse, they even don't want to release me as if I have ever committed any crime here. I think they wanna kill me and deport a dead body. I am so frustrated Jennifer wondering if they have a personal grudge against me! have a blessed night.

**APR.**
**15**
**19:18**

**From:** Steven Tendo
**Subject:**

they have denied my kosher diet that they only give it to Jews who are only two in the entire detention center, says the new chaplain.

**APR.**
**16**
**14:19**

**DOCUMENT 9**

**LAW OFFICES OF LISA S. BRODYAGA**
**17891 Landrum Park Rd.**
**San Benito, Texas 78586**
**(956) 421-3226**
**April 5, 2020**

Re: Steven Tendo
A201 520 012

To Whom It May Concern

This will confirm that I am representing Mr. Tendo in his petition for review to the Fifth Circuit, of the Decision of the Board of Immigration Appeals, dated December 12, 2019.

His opening brief is due April 8, 2020, and I am better than half finished. In my opinion, he has an exceptionally strong case, for the following reasons.

First, the Immigration Judge denied asylum *solely* because he claimed that he did not believe Mr. Tendo's story, and notwithstanding reams of corroborating evidence. And the reasons he gave were minor discrepancies that had nothing to do with the merits of Mr. Tendo's claim. Second, he did not cite demeanor as one of the reasons he did not believe Mr. Tendo. This means that his determination is not entitled to "deference," but is adjudicated in the same manner as any other factual finding.

Third, the motion to reopen to the Board of Immigration Appeals, which was filed December 31, 2019, is still pending. It is based on the brutal attack on his twin sister which occurred on December 25, 2019, by government thugs who believed that he had been sent back to Uganda, and that his sister was hiding him. There is a mountain of evidence supporting her claim, including color photos of her at the clinic, a letter from the clinic, and a photo of its front (to show that it exists), plus a photo of her smashed phone, and affidavits from her and from a distant relative who works for the government, and who learned by chance, of the procedure that would be followed if he were removed. In short, he would be handed over to the security forces at the airport, and given all the evidence showing their intent to kill him, he would never emerge alive.

Because we filed the motion to reopen so quickly, it is included in the Certified Administrative Record. And although it is not part of the record leading to the BIA order, it is a proper subject of judicial notice, under Rule 201, Federal Rules of Evidence. This rule states that the Court *must* take judicial notice if provided with materials that are not subject to reasonable dispute, and a request is made for judicial notice. We are making that request, and the materials are already in their hands.

Once our brief is filed, the Government has thirty days to respond, which may be extended, and once it is filed, we have the opportunity to file a reply. It then takes many months before a decision would be issued. Further, if the BIA grants the motion to reopen, the petition for review is mooted. And if it is denied, a second petition for review would follow. If the first petition is still pending, the two cases will be consolidated. So there is no chance that the case will be resolved any time soon.

It is also my understanding that his medical situation has deteriorated. It therefore sincerely hope that he can be released on medical parole as soon as possible.

Thank you for your prompt consideration.

Sincerely,

Lisa S. Brodyaga, Attorney

**DOCUMENT 10**



**American Diabetes Association**

Connected **for Life**

Dear Detention Center:

The American Diabetes Association, in its position as a global authority on diabetes and author of the *Standards of Care for Diabetes*, writes to share information that is important for facilities that detain people under criminal or civil law during the COVID-19 pandemic.

Medical Information Concerning Diabetes and COVID-19

During the COVID-19 pandemic, the American Diabetes Association recommends that people with diabetes avoid crowds, especially in poorly ventilated spaces. This is because the risk of exposure to COVID-19 increases in crowded, closed-in settings with little air circulation if there are people in the crowd who are sick.

People with diabetes face a higher chance of experiencing serious complications from COVID-19.

In general, people with diabetes are more likely to experience severe symptoms and complications when infected with a virus.

When people with diabetes experience fluctuating blood sugars, they are generally at risk for a number of diabetes-related complications. Having heart disease or other complications in addition to diabetes could worsen the chance of getting seriously ill from COVID-19, like other viral infections, because the body's ability to fight off an infection is compromised.

Viral infections can also increase inflammation, or internal swelling, in people with diabetes. This is also caused by above-target blood sugars, and both could contribute to more severe complications.

When sick with a viral infection, people with diabetes face an increased risk of DKA (diabetic ketoacidosis), commonly experienced by people with type 1 diabetes. DKA can make it challenging to manage fluid intake and electrolyte levels—which is important in managing sepsis. Sepsis and septic shock are some of the more serious complications that people with COVID-19 have experienced.

In general, we don't know of any reason to think COVID-19 will pose a difference in risk between type 1 and type 2 diabetes.

2451 Crystal Drive
Suite 900
Arlington, VA 22202

1-800-DIABETES (342-2383)

diabetes.org
@AmDiabetesAssn



## Information Pertaining to the Detention Setting

People detained in crowded locked facilities *are* at significantly elevated risk of contracting infectious diseases like COVID-19 because of the close confines in which they live. The scientific evidence available demonstrates that COVID-19 is highly contagious.

Based on medical expert guidance, governments are taking aggressive steps to minimize people congregating in crowded spaces, in an effort to reduce transmission of this dangerous virus.  Some jurisdictions have issued "shelter in place" orders for residents, directing them to limit their contact with others except for the most essential of purposes.

Detention facilities frequently lack the health care resources, space, and staffing to care for people who are acutely ill. This is of heightened concern during these times of a dangerous pandemic. When a high number of detained people take ill, the number of people requiring acute care can quickly overwhelm on-site medical resources, with outside facilities increasingly pressed to their limits.

Because people with diabetes face a significant and higher-than-average risk of getting *seriously* ill if infected with the COVID-19 virus, up to and including the risk of death, criminal and civil detention facilities (prisons, jails, juvenile facilities, immigration detention centers, psychiatric institutions, etc.) should take aggressive steps to protect both the health of these individuals and larger public health interests in our communities.

Local officials should explore all possible strategies to release people with diabetes and other serious risk factors related to COVID-19, and to reduce the level of crowding in detention facilities.  Medical furloughs, compassionate release, and pretrial or early release for those most vulnerable to the virus are among options to be considered.

People in detention also need to be provided with ready access to warm or hot water, soap and sanitizer, and adequate hygiene and cleaning supplies both for handwashing and for cleaning their living area.

People in detention should also be educated on the importance of proper handwashing, coughing into their elbows, and social distancing to the extent practicable. Information about the spread of the virus, the risks associated with it, and prevention and treatment measures must be based on the best available science. Education should be reiterated upon release to best inform individuals on how to prepare for a healthy return to the public.

2451 Crystal Drive
Suite 900
Arlington, VA 22202

1-800-DIABETES (342-2383)

diabetes.org
@AmDiabetesAssn



March 13, 2020

Daniel Bible
ICE ERO San Antonio Field Office Director
ICE Enforcement and Removal Operations
San Antonio Field Office
1777 NE Loop 410 Floor 15
San Antonio, TX 78217
SanAntonio.Outreach@ice.dhs.gov

Re: Immediate Release of Detained Families and Individuals Due to COVID-19

Director Bible:

As the Refugee and Immigrant Center for Education and Legal Services (RAICES) represents detained immigrants, we write to voice our concern about the impending spread of COVID-19 and to inquire regarding how Immigration  and Customs Enforcement (ICE) detention centers in the San Antonio Area of Responsibility plan to respond to the crisis. We also write to request the release of all individuals and families who are currently in immigration detention within your area of responsibility.

As public health agencies around the world vigorously prepare for and deal with COVID-19's impact, we urge you to share your plan publicly and immediately. This virus is highly contagious, and people detained in close quarters are particularly susceptible to infection and to rapidly spreading the illness.

Our legal representation and support of our clients depend on our ability to meet with them in person.  We are concerned about the health and safety of our clients who, with their liberty restricted in detention, cannot practice recommended social distancing from other detained persons or from detention center staff.  Additionally, our own health and safety should not be placed in jeopardy as we seek to continue to zealously advocate for our clients. The health and safety of ICE and contractor personnel are also at risk in the close quarters of an immigration prison.  Because the environment of a detention center is an inherently unsafe space in a global pandemic, everyone in immigration detention should be released immediately.



Connected for Life

Conclusion

Thank you for considering this information as you work to ensure that detainees with diabetes are safe during a difficult time for all. For more information on this topic, the ADA has additional resources here: https://www.diabetes.org/diabetes/treatment-care/planning-sick-days/coronavirus and here: https://care.diabetesjournals.org/content/37/Supplement_1/S104.

2451 Crystal Drive
Suite 900
Arlington, VA 22202

1-800-DIABETES (342-2383)

diabetes.org
@AmDiabetesAssn

**DOCUMENT 11**

**From:** Berg, Peter B
**To:**
**Cc:**

**Subject:** Updated Guidance: COVID-19 Detained Docket Review— Effective Immediately
**Date:** Saturday, April 4, 2020 5:17:40 PM

**UPDATE: Please see the updated guidance below. The previous version of this guidance is rescinded.**

**This message is sent from Peter B. Berg, (a)Assistant Director, Field Operations**

**To:          Field Office Directors and Deputy Field Office Directors**

**Subject:      COVID-19 Detained Docket Review**

**Background:**

U.S. Immigration and Customs Enforcement (ICE) has taken a number of significant and proactive measures in response to the Coronavirus Disease 2019 (COVID-19) pandemic, in order to mitigate the spread of COVID-19 to aliens detained in its custody, its workforce, and stakeholders at its detention facilities. As more becomes known about the virus, ERO will continue to update its practices and guidance in this regard. General ICE COVID-19 guidance is available here and will be updated and supplemented on an ongoing basis.

On March 18, 2020, you were directed to review the cases of aliens detained in your area of responsibility who were over the age of 70 or pregnant to determine whether continued detention was appropriate. The Centers for Disease Control and Prevention (CDC) has developed a list of categories of individuals identified as potentially being at higher-risk for serious illness from COVID-19. Expanding on that list, ERO has identified the following categories of cases that should be reviewed to re-assess custody:

- Pregnant detainees or those having delivered in the last two weeks
- Detainees over 60 years old
- Detainees of any age having chronic illnesses which would make them immune-compromised, including but not limited to:
    - Blood Disorders
    - Chronic Kidney Disease
    - Compromised immune system (e.g., ongoing treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications)
    - Endocrine disorders

- o Metabolic disorders
- o Heart disease
- o Lung disease
- o Neurological and neurologic and neurodevelopment conditions

As part of your ongoing application of the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (available here), please identify all cases within your AOR that meet any of the criteria above and validate that list with assistance from IHSC or your Field Medical Coordinator to ensure the conditions listed are still present and do result in the detainee potentially having a higher risk for serious illness from COVID-19. After identifying a case as meeting any of the above criteria, you should review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic.

The presence of one of the factors listed above should be considered a significant discretionary factor weighing in favor of release. To be clear, however, it may not always be determinative. Field offices must remain cognizant of the requirements of mandatory detention. Section 236(c) of the Immigration and Nationality Act (INA) mandates the detention of certain categories of criminal and terrorist aliens during the pendency of removal proceedings. Such aliens may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19. INA § 236(c); 8 C.F.R. § 236.1(c)(1)(i). Such aliens may only be released following a final order issued by an immigration judge, the Board of Immigration Appeals, or a federal court granting the alien relief, dismissing proceedings, or terminating proceedings. Similarly, pursuant to section 241(a)(2), certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day removal period even if potentially higher-risk for serious illness from COVID-19. INA § 241(a)(2). For alien's subject to discretionary detention under section 236(a), please remember that release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons. 8 C.F.R. § 236.1(c)(8).

When reviewing cases of alien's subject to discretionary detention under 236(a), the following must be completed:
- **Cases involving any arrests or convictions for any crimes that involve risk to the public regardless of the date of arrest or conviction must be reviewed and approved by a Deputy Field Office Director (DFOD) or higher before a determination is made to release.**
  - o Examples of crimes that involve a risk to the public include any crime that: involves any form of violence, driving while intoxicated, threatening behaviors, terroristic threats, stalking, domestic violence, harm to a child, or any form of assault or battery. This list is not intended to be

comprehensive. If there is any doubt whether a crime involves risk to the public, consult with your Office of the Principal Legal Advisor (OPLA) field location and your respective Deputy Assistant Director for Domestic Operations before a custody redetermination is completed.

- You may consider the age of an arrest or conviction as a mitigating or an aggravating factor, but the age of an arrest or a conviction does not automatically outweigh public safety concerns.

With regard to arriving aliens and certain other aliens eligible for consideration of parole from custody, under current circumstances and absent significant adverse factors, the fact that an alien is potentially higher-risk for serious illness from COVID-19, may form the basis for a determination that "continued detention is not in the public interest," justify release under 8 C.F.R. § 212.5(b)(5).

For other aliens for whom there is discretion to release, field offices remain responsible for articulating individualized custody determinations, taking into consideration the totality of the circumstances presented in the case. The fact that an alien is potentially higher-risk for serious illness from COVID-19 should be considered a factor weighing in favor of release. You may also consider alternatives to detention consistent with ICE ATD policies, if ATD is determined to sufficiently mitigate the risk of flight.

Any releases attributed to reviews of COVID-19 susceptibility shall be documented in the ENFORCE Alien Removal Module (EARM) under Special Class - COVID-19 Chronic Care Release. As previously communicated, these individuals should be placed on ATD if possible.

Please contact your local OPLA field location should you have any questions or concerns regarding your authority to release in any individual case.

**For any questions on this guidance, please contact your respective Deputy Assistant Director for Domestic Operations.**

**Limitation on the Applicability of this Guidance**. This message is intended to provide internal guidance to the operational components of U.S. Immigration and Customs Enforcement. It does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

**DOCUMENT 12**

## STANDARD 4.1

### FOOD SERVICE

### I.   POLICY

The facility shall provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation.

### II.   STANDARDS AND PROCEDURES

#### A.  Administration

##### 1.  Food Service Administrator (FSA) or Equivalent

The food service program shall be under the direct supervision of a professional food service administrator (FSA). The FSA is responsible for planning, controlling, directing, and evaluating food service; training staff and detainees; managing budget resources; establishing standards of sanitation, safety, and security; developing nutritionally adequate menus and evaluating detainee acceptance; developing specifications for the procurement of food, equipment, and supplies; and ensuring a quality food service program.

#### B.  General Policy

##### 1.  Custody and Security

The facility's custody and security policy and procedures shall address the buildings or portions of buildings housing the food service department; all types of detainee traffic in and out of the department; detainee behavior; control of utensils with a custodial hazard potential (knives, cleavers, saws, tableware, etc.); official counts and/or census; and any other matters having a direct or indirect bearing on custody and security.

The facility will devise and provide appropriate training to all food service personnel in detainee custodial issues.

##### 2.  Knife Control

Knives must be physically secured to workstations or used only under direct staff supervision.

### 3. Controlled Food Items/Hot Items

All facilities shall have procedures for the storage and handling of food items that pose a security threat, including, but not limited to, yeast, mace, nutmeg, cloves, and alcohol-based flavorings.

### 4. Detainee Clothing

Detainees assigned to the food service department shall have a neat and clean appearance. Detainees will be issued appropriate safety and sanitation garments and protective coverings, for example, for freezers or garbage duty.

### 5. Detainee Job Descriptions

The FSA shall review detainee job descriptions annually to ensure they are accurate and up-to-date. Before starting work in the department, the detainee will sign for receipt of the applicable job description.

### 6. Detainee Orientation and Training

To ensure a quality food service program and instill good work habits, each FSA or designee shall instruct newly assigned detainee workers in the rules, safety measures, and procedures of the food service department.

## C. Food Service Dining Room/Satellite Feeding Operations

### 1. General Policy

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered, and served under staff (or contractor) supervision.

### 2. Display and Service

The following procedures apply to the display, service, and transportation of food to mainline and satellite food service areas:

a. Food is fit for consumption and appropriately presented;

b. Sanitary guidelines are observed, with hot foods maintained at a temperature of at least 135 degrees F and foods that require refrigeration maintained at 41 degrees F or below.

c. Every open food item and beverage shall be protected from contaminants by clean sneeze-guards, cabinets, display cases, or other such equipment.

d. Servers must wear plastic gloves whenever direct contact with a food, ice, or beverage is possible. They must use tongs, forks, spoons, ladles, or other such utensils to serve any food or beverage.

e. Utensils shall be sanitized as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service.

f. If the facility cannot maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be discarded after two hours at room temperature.

g. Food will be delivered from one place to another in covered containers. If the food carts do not have locking devices, they must be supervised by facility staff.

h. All food safety provisions (sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

i. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

j. A member of the food service staff will oversee the loading of satellite-feeding carts. Staff shall inspect and secure all food carts before allowing their removal from the food service area.

## D. **Menu Planning**

### 1. **General Policy**

The FSA shall base menu selections on a nutritional program meeting or exceeding minimum U.S. recommended daily allowances. The FSA shall consider the ethnic and religious diversity of the facility's detainee population when developing menu cycles.

### 2. **Nutritional Analysis**

A registered dietitian shall conduct an annual complete nutritional analysis of every master-cycle menu planned by the FSA. Menus must be certified by the dietitian before implementation. If necessary, the FSA shall modify the menu in light of the nutritional analysis, to ensure nutritional adequacy.

### E. Food Preparation

#### 1. General Policy

The FSA is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. The FSA or designee has the authority to change menu items when necessary. Every such change/substitution must be documented and forwarded to the FSA. The FSA or designee shall exercise this menu-changing authority as infrequently as possible.

#### 2. Preparation Guidelines

Food shall be prepared and served in compliance with the most recent version of the FDA food code and/or applicable local standards. Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

The FSA or designee shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding, or refrigeration temperatures of all potentially hazardous foods.

#### 3. Food Protection - General Requirements

Food and ice will be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage, and other sources of contamination. Protection will be continuous, whether the food is in storage, in preparation/on display, or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. Refrigeration equipment shall be designed and operated to maintain temperature of 41 degrees F or below.

#### 4. Leftovers

Prepared and properly maintained food items which have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained but discarded immediately after offering. All saved prepared food shall be labeled to identify the product, preparation date, and time.

### F. Religious/Special Diets

#### 1. General Policy

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the security and orderly operations of the facility. While each request

for religious diet accommodation is to be determined on a case-by-case basis, ICE/ERO anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility.

To initiate or end a religious diet program, the detainee will provide a written statement articulating the religious motivation for participation in or termination of the religious diet program, as appropriate. Oral interpretation or written assistance shall be provided to illiterate or limited English proficient detainees as necessary in completing this statement. Auxiliary aids and services, accommodations, and/or staff assistance shall be provided to detainees with disabilities as needed in completing this statement to ensure their equal access to the facility's religious diet program. A copy of the request and decision granting or denying it should be kept in the detainee's detention file or in a retrievable electronic format.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his or her designee, shall consult with ICE/ERO prior to denying the request or prior to removing a detainee from the program.

## 2. Common-Fare Menu

Facilities must make available a "common fare" menu, which serves as the foundation to which modifications may be made to accommodate the religious diets of various faiths (e.g., for the inclusion of halal flesh-food options). Common fare represents a no-flesh protein option, offering vegetables, starches, and other foods that are not seasoned with flesh, and must be provided whenever an entrée containing flesh is offered as part of a meal.

In addition, hot entrées should be available to accommodate detainee's religious dietary needs and should be purchased, prepared, and served in a manner that does not violate the religious requirements of any faith group.

Common fare is a no-flesh protein option intended to accommodate detainees whose religious dietary needs cannot be met on the main line. The common-fare menu is based on a 14-day cycle, with special menus for the 10 Federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements, meeting or exceeding U.S. recommended daily allowances (RDAs).

## 3. Changes to the Standard Common-Fare Menu

Modifications of the standard common-fare menu may be made at the local level for various reasons, such as to meet the requirements of faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

### 4. Hot Entree Availability

To the extent practicable, a hot entree shall be available to accommodate detainees' religious dietary needs, e.g., kosher and/or halal products. Hot entrees shall be offered five times a week and shall be purchased precooked, heated in their sealed containers, and served hot.

### 5. Religious Requirements

With the exception of fresh fruits and vegetables, the facility's kosher and/or halal food purchases shall be fully prepared, ready-to-use, and bearing the symbol of a recognized kosher and/or halal certification agency.

### 6. Plates and Utensils

Common-fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common-fare service only. Separate cutting boards, knives, food scoops, food inserts, and other such tools, appliances, and utensils shall be used to prepare common-fare foods and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other.

### 7. Ceremonial Meals, Religious Fasts, and Seasonal Observances

The chaplain, in consultation with local religious leaders, if necessary, shall develop the ceremonial-meal schedule for the subsequent calendar year, providing it to the facility administrator. This schedule shall include the date, religious group, estimated number of participants, and special foods required. Ceremonial and commemorative meals shall be prepared in the food service facility unless otherwise approved by the facility administrator.

The common-fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of the year.

## G. Medical Diets

### 1. Therapeutic Diets

Detainees with certain conditions–chronic or temporary; medical, dental, and/or psychological–shall be prescribed special (therapeutic) diets, supplemental meals, or snacks as appropriate by authorized medical staff. If a prescribed medical diet conflicts with a common-fare diet, the medical diet takes precedence.

Pregnant detainees may also have additional nutritional and caloric requirements. (See Standard 4.3 Medical Care.)

## H. Specialized Food Service Programs

### 1. Satellite Feeding

Food transported to housing units or other locations shall be transported in thermal containers that maintain cold items at temperatures below 41 degrees F and hot items at temperatures above 135 degrees F, excluding items served within the two-hour window for food safety.

### 2. Segregation Food Rations

Food rations shall not be reduced or changed or used as a disciplinary tool.

### 3. Sack Meals

Sack meals shall meet nutritional minimums and be provided for detainees being transported from the facility and detainees arriving/departing between scheduled meal hours. Detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation but may prepare sack meals for on-site consumption.

## I. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department in accordance with the most recent edition of the U.S. Food and Drug Administration (FDA) Food Code and/or applicable local standards.

### 2. Personal Hygiene of Staff and Detainees

a.  All food service personnel shall wear clean garments, maintain a high level of personal cleanliness, and practice good hygiene while on duty. They shall wash hands thoroughly with soap or detergent before starting work, and as often as necessary during the shift to remove soil or other contaminants.

b.  Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent.

c.  All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations.

d.  Staff and detainees who prepare or serve food shall not clean latrines, garbage cans, sewers, drains, grease traps, or for other duties during the period of food preparation.

e.  Rubber soled safety shoes shall be provided and used by all detainees working in food service.

## 3.  Medical Examination

a.  All food service personnel (both staff and detainee) shall receive a documented pre-employment medical examination. Detainees who have been absent from work for any length of time for reasons of communicable illness (including diarrhea) shall be referred to Health Services for a determination as to fitness for duty prior to resuming work.

## 4.  Daily Health Checks

Food Service staff will inspect all detainee food service workers daily at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected), or infected cuts or boils shall be removed from the work assignment and immediately referred to Health Services for determination of duty fitness. The detainees shall return to work only after the FSA has received written clearance from Health Services staff.

## 5.  Environmental Sanitation and Safety

All facilities shall meet the following environmental standards:

a.  Clean, well-lit, and orderly work and storage areas.

b.  Overhead pipes removed or covered, to eliminate the food-safety hazard posed by leaking or dusty pipes.

c.  Routinely cleaned walls, floors, and ceilings in all areas.

d.  Ventilation hoods, to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food-contact surfaces. Filters or other grease- extracting equipment shall be readily removable for cleaning and replacement.

e.  Eighteen-inch clearance (minimum) underneath sprinkler deflectors.

f.  Hazard-free storage areas:

1)  Bags, containers, bundles, etc., stored in tiers; stacked, blocked, interlocked, and limited in height for stability/security against sliding or collapsing.

2)  No flammable material; no loose cords, debris, or other obvious accident-causers (stumbling, tripping, falling, etc.); no pest-harborage.

g.  Aisles and passageways shall be kept clear and in good repair, with no obstruction that could create a hazard or hamper egress.

h.  To prevent cross-contamination, kitchenware and food-contact surfaces should be washed, rinsed, and sanitized after each use and after any interruption of operations during which contamination could occur.

i.  A ready supply of hot water (105-120 degrees F).

j.  Garbage and other trash shall be collected and removed as often as possible. The garbage/refuse containers shall have sufficient capacity for the volume, and shall be kept covered, cleaned frequently, and insect and rodent proof. The facility shall comply with all applicable regulations (local, state, and federal) on refuse-handling and disposal.

## 6.  Equipment Sanitation

Information about the operation, cleaning, and care of equipment will be obtained from manufacturers or local distributors. The FSA shall develop a schedule for the routine cleaning of equipment. The facility will adhere to the health and safety standards of the FDA and/or state or local authorities with oversight of food service operations.

a.  Manual Cleaning and Sanitizing

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (walls, windows, vent hoods, etc.) and equipment (chairs, tables, fryers, ovens, etc.) will be grouped by frequency of cleaning, e.g., After Every Use, Daily, Weekly, Monthly, Semi-annually, or Annually.

b.  Mechanical Cleaning and Sanitizing

Spray- or immersion-dishwashers or devices, including automatic dispensers for detergents, wetting agents, and liquid sanitizer, shall be maintained in good repair.

## 7.  Lavatories

Toilet facilities shall be provided for all food service staff and detainee workers. Toilet facilities, including rooms and fixtures, shall be kept clean and in good repair. Signs shall be prominently displayed directing all personnel to wash hands after using the toilet.

Soap or detergent and paper towels or a hand-drying device providing heated air shall be available at all times in each lavatory.

**8. Pest Control**

Good sanitation practices are essential to an effective pest control program. The facility is responsible for pest control in the food service department.

**9. Hazardous Materials**

a. Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment, and utensils shall be used in the food service department.

b. All staff members shall know where and how much toxic, flammable, or caustic material is on hand, and be aware that their use must be controlled and accounted for daily.

c. All containers of toxic, flammable, or caustic materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable, and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

**10. General Safety Guidelines**

Machines shall be guarded in compliance with OSHA standards.

a. Light fixtures, vent covers, wall-mounted fans, decorative materials, and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

b. Lights in food-production areas, utensil- and equipment-washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

c. An approved, fixed, fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers, and open flame devices. A qualified contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

d. Hood systems shall be cleaned after each use to prevent grease build-ups, which constitute fire risks. All deep-fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

**11. Mandatory Inspections**

a. The facility shall implement written procedures for the administrative or food service, personnel conducting the weekly inspections of all food service areas, including dining, storage, equipment, and food-preparation areas and an annual

independent inspection ensuring that all governmental health and safety codes are being met. Staff shall check refrigerator and water temperatures daily, recording the results.

b. Daily checks of equipment temperatures shall follow this schedule:

1) Dishwashers: every meal;

2) Pot and pan-washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation the required minimum temperature shall be maintained in accordance with the applicable local food code;

3) Refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed and accessible.

## J. Food Storage, Receiving and Inventory

### 1. General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving, and inventorying food.

### 2. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a. Inspect the incoming shipment for damage, contamination, and pest infestation. Rats, mice, or insects may be hiding in the middle of a pallet.

b. Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms, mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells, or other sources of contamination.

### 3. Inventory

The FSA shall base inventory levels on facility needs; however, each facility will at all times stock a 3-day-minimum food supply. Inventory levels shall be established, monitored, and periodically adjusted to correct excesses or shortages.

## STANDARD 4.3

### MEDICAL CARE

## I.   POLICY

All detainees shall have access to appropriate medical, dental, and mental health care, including emergency services. Each medical facility will strive for accreditation with National Commission on Correctional Health Care.

## II.   STANDARDS AND PROCEDURES

### A.  General

Every facility shall directly or contractually provide its detainee population with the following:

1.  Initial medical, mental health and dental screening;

2.  Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services at no cost to the detainee;

3.  Comprehensive, routine and preventive health care, as medically indicated;

4.  Emergency care;

5.  Specialty health care;

6.  Timely responses to medical complaints;

7.  Hospitalization as needed within the local community; and

8.  Staff or professional language services necessary to allow for meaningful access for detainees with limited English proficiency (LEP), and effective communication for detainees with disabilities, during any medical or mental health appointment, sick call, treatment, or consultation.

The health care program and the medical facilities will be under the direction of a Health Services Administrator (HSA) and/or Clinical Medical Authority (CMA). When the HSA is not a physician, final clinical judgment shall rest with the facility's designated CMA.

Facilities will employ sufficient medical staff to perform basic exams and treatments for all detainees. The HSA will negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not available within the

facility. These arrangements will include appropriate custodial officers to transport and remain with the detainee for the duration of any off-site treatment or hospital admission.

**B. Facilities**

Adequate space and equipment will be furnished so that all detainees are provided basic health examination, treatment, and communication in private. Medical records will be kept separately from detainee records and stored in a securely locked area. All pharmaceuticals will be stored in a secure area and temperature controlled to ensure no alteration in potency.

**C. Health Care Staff**

Health care staff shall have a valid professional licensure and/or certification for the jurisdiction in which they practice and will perform duties within the scope of their clinical license. The following terms apply to health care staff referred to throughout this standard.

1.  Health Care Practitioner: Defined as an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

2.  Mental Health Provider: Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker, or any other mental health professional who, by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients.

**D. Medical Screening (New Arrivals)**

As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care practitioner or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any disabilities or impairments affecting major life activities. Any detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care practitioner as quickly as possible, but no later than two working days. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process. For intra-system transfers, a health care practitioner will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

Facilities shall have policies and procedures to ensure documentation of the initial health screening and assessment.

1. **Tuberculosis**

All new arrivals shall receive tuberculosis (TB) screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines, including, but not limited to, <u>CDC Guidelines for Correctional Facilities,</u> prior to being placed in general population. For detainees who have been in continuous law enforcement custody, symptom screening plus documented TB screening within one year of arrival may be accepted for intake screening purposes.

Detainees with symptoms suggestive of pulmonary TB disease and/or with suspected or confirmed TB disease based on historical, clinical and/or laboratory findings will be housed in an airborne infection isolation room with negative pressure ventilation and promptly evaluated for TB disease. Detainees with suspected pulmonary TB disease will remain in airborne infection isolation until determined by a health care practitioner to be noncontagious in accordance with CDC guidelines. All detainees with suspected or confirmed TB disease will be evaluated for human immunodeficiency virus (HIV), and all detainees with HIV shall be evaluated for TB disease, which includes a chest x-ray. The CMA will consult with the local or state TB program on all aspects of health and public health care for detainees with suspected or confirmed TB disease, including testing, treatment, release from isolation, placement in general population, and public health actions.

2. **Infectious and Communicable Diseases**

The facility will have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, and education. This also includes reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.

E. **Comprehensive Health Assessment**

The facility will conduct and document a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival at the facility. Health assessments shall be performed by a physician, physician assistant, nurse practitioner, registered nurse (RN) (with documented initial and annual training provided by a physician), or other health care practitioner, as permitted by law. When a physical examination is not conducted by a provider, it must be reviewed by a provider. If there is documented evidence of a comprehensive health assessment within the previous 90 days, the health care practitioner may determine that a new assessment is not required.

F. **Substance Dependence and Detoxification**

During the initial screening, all detainees shall be evaluated for their use of or dependence on mood and mind-altering substances including alcohol, opiates, hypnotics, and sedatives.

Detainees reporting the use of such substances shall be evaluated for their degree of reliance and potential for withdrawal. The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification. If females are housed at the facility, guidelines will specifically address the treatment of pregnant women who are chemically dependent. Treatment and supportive measures shall be provided to permit withdrawal with minimal discomfort.

Where a detainee requires hospitalization, a physician's order will be obtained and ICE/ERO shall be notified. Detainees experiencing severe or life-threatening alcohol or drug withdrawal shall be immediately transferred to an emergency department for evaluation. Once evaluated, the detainee will be treated on-site if the facility is qualified to provide treatment and monitoring for withdrawal or transferred to an appropriate facility.

G. **Translation, Interpretation, and Language Access for Detainees with Limited English Proficiency**

Facilities shall provide appropriate interpretation and language services for LEP detainees related to medical and mental health care. When appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be used in an emergency medical situation.

H. **Dental Treatment**

An initial dental screening exam shall be performed within 14 days of the detainee's arrival. If no on-site dentist is available, the initial dental screening may be performed by a physician, physician assistant, nurse practitioner, or registered nurse. Such non-dental clinicians shall be trained annually on how to conduct the exam by a dentist.

Detainees shall be afforded only authorized dental treatment, defined as follows:

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection.

2. Routine dental treatment may be provided to detainees for whom dental treatment is inaccessible for prolonged periods because of detention for over six months. Routine dental treatment includes amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the repair and adjustment of prosthetic appliances, and other procedures required to maintain the detainee's health.

I. **Sick Call**

The facility will have regularly scheduled times, in accordance with facility policy, when medical personnel are available to see detainees who have requested medical services, commonly known as sick call.

The facility will have a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting. If necessary, detainees shall be provided assistance in filling out the request, especially detainees with a disability, or who are illiterate or LEP.

The facility shall have procedures to ensure that all request slips are received and triaged by the medical staff within 24 hours of receipt of the request. Request slips shall be provided in English and Spanish, at a minimum.

A health care practitioner will review the request and determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time.

All detainees, including those in Special Management Units, regardless of classification, will have access to sick call.

## J. 24-Hour Emergency Medical and Mental Health Treatment

The facility will have a written plan for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required.

## K. First Aid and Medical Emergencies

The CMA will determine the availability and placement of first aid kits.

Detention staff and health care staff will be trained to respond to health-related emergencies within a 4-minute response time. This training will be provided by a responsible medical authority in cooperation with the facility and will include the following:

a. The recognition of signs of potential health emergencies and the required response;

b. The administration of first aid and cardiopulmonary resuscitation (CPR);

c. The recognition of signs and symptoms of mental illness; and

d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

If a detainee requires emergency medical care, the first responding officer will immediately take steps to contact a health care practitioner through established procedures.

**L.** <u>Delivery of Medication</u>

Medication will be distributed according to the specific instructions and procedures established by the health care provider. Health care providers and officers shall keep written records of all medication given to (or refused by) detainees.

Medication will not be delivered or administered by detainees. In facilities that are medically staffed 24 hours a day, a health care practitioner will distribute medication. In facilities that are not medically staffed 24 hours a day, medication may be distributed, consistent with state law and/or regulations, by detention officers who have received proper training, but only when medication must be delivered at a specific time when medical staff is not on duty. Distribution of medication by non-medical staff will be according to the specific instructions and procedures established by the CMA.

**M.** <u>Special Needs</u>

The facility will notify ICE/ERO of any detainee who requires close medical supervision, including chronic and convalescent care. The facility shall develop a written treatment plan, including access to health care and other treatment, and coordination with non-medical personnel as necessary.

The facility will notify ICE/ERO of any self-identified transgender detainees and coordinate care with ICE/ERO based on medical needs.

**N.** <u>Bloodborne Pathogens</u>

See also Standard 1.1 "Environmental Health and Safety" for additional information.

Information regarding infectious diseases shall be communicated on a regular basis to non-medical and medical staff, as well as detainees. Detainees exposed to potentially infectious bodily fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the detainee's medical file. All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

The facility shall establish a written plan to address exposure to bloodborne pathogens and post-exposure intervention, including prophylactic administration of medication, as appropriate and according to facility policies; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

**1. Hepatitis**

A detainee may request hepatitis testing at any time.

## 2. HIV

A detainee may request HIV testing at any time. Facilities shall develop a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies.

## 3. Clinical Evaluation and Management

Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America. Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) approved medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Any detainee with confirmed or suspected TB disease shall also be evaluated for possible HIV infection, and any detainee with HIV shall be evaluated for TB disease.

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure that newly admitted detainees are able to continue with their treatment without interruption. Upon release, detainees currently receiving anti-HIV therapy and other drugs shall receive up to a 30-day supply of their medications as medically appropriate.

When current symptoms suggest HIV infection, the following procedures shall be implemented.

a. Clinical evaluation shall determine the medical need for isolation, but HIV infection cannot be the sole reason for isolation. Segregation of HIV-positive detainees is not necessary for public health purposes. Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation.

b. Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, a qualified health care practitioner shall recommend the detainee's transfer to a local hospital or other appropriate facility

for further medical testing, final diagnosis, and acute treatment, as needed, and consistent with local and national standards.

c.  New HIV-positive diagnoses must be reported to government bodies according to state and local laws and requirements; the HSA is responsible for ensuring that all applicable state requirements are met.

## O.  Informed Consent

The facility health care practitioner will obtain specific signed and dated consent forms from all detainees before any medical examination or treatment, except in emergency circumstances. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medications side effects, shall be obtained.

As a rule, medical treatment shall not be administered against the detainee's will. If a detainee refuses treatment, ICE/ERO will be consulted in determining whether forced treatment will be administered, unless the situation is an emergency. In emergency situations or those that place other detainees or staff at risk of exposure to infectious agents, the facility shall take appropriate emergency measures and notify ICE/ERO as soon as possible.

If the detainee refuses to consent to treatment, medical staff will explain the medical risks to the detainee of declining treatment and make reasonable efforts to convince the detainee to voluntarily accept treatment in a language or manner that the detainee understands. Medical staff will document their treatment efforts and the refusal of treatment in the detainee's medical record. A detainee refusing examination or treatment may be segregated from the general population when recommended by the medical staff. Forced treatment is prohibited unless there is a valid court order authorizing involuntary medical treatment.

## P.  Confidentiality and Release of Medical Records

All medical personnel, and in particular those who have access to medical records, shall protect the privacy of detainees' medical information to the maximum extent possible while permitting the exchange of health information required to fulfill program responsibilities and to provide for the well-being of detainees.

Detainees and their representatives shall be allowed to request and receive medical records pursuant to facility policy, which shall be communicated to the detainee in the facility handbook. Detainees and their representatives may also request medical records through the detainee's designated ICE officer or the ICE Freedom of Information Act (FOIA) process as described in the National Detainee Handbook.

Detainees who indicate that they wish to obtain copies of their medical records shall be provided with any appropriate forms. The facility will provide the detainee with assistance

in making the written request (if needed) and will assist in transmitting the request to the appropriate office or person.

Following the release of health information, the written authorization shall be retained in the health record, and a copy placed in the detainee's detention file or maintained in a retrievable electronic format.

**Q. Transfer and Release of Detainees**

**1. Medical/Psychiatric Alert**

When a health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility, or requires medical escort during removal or transfer, the facility shall notify ICE/ERO in writing.

**2. Notification of Transfers, Releases, and Removals**

Medical personnel will be given advance notice prior to the release, transfer, or removal of a detainee, so that they may provide for any medical needs associated with the transfer or release.

**3. Transfer of Medical Information**

a. When a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the detainee. Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within five business days or sooner if determined by the receiving facility to be a medically urgent matter.

b. Upon removal or release from ICE/ERO custody, the detainee shall be provided medication (in quantities specified below), referrals to community-based providers as medically appropriate, and a detailed medical care summary. This summary should include instructions that the detainee can understand and health history that would be meaningful to future medical providers. The summary shall include, at a minimum, the following items:

1) Patient identification;

2) Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

3) Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

4) Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5) Any past hospitalizations or major surgical procedures;

6) Recent test results, as appropriate;

7) Known allergies;

8) Any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility. In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE/ERO custody are given a list of community resources, at a minimum;

9) Copies of any relevant documents as appropriate;

10) Printed instructions on how to obtain the complete medical record; and

11) The name and contact information of the transferring medical official.

### 4. Medications

The facility shall ensure that, at a minimum, a seven-day supply of medication (or, in the case of TB medications, 15 days; and in the case of HIV/AIDS medications, 30 days) accompanies the detainee upon transfer from the facility, as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a medical care summary. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee.

### R. Medical Experimentation and Research

Detainees shall not be used in any medical, pharmaceutical, or cosmetic experiments or research.

This will not preclude an individual detainee from receiving a medical treatment or procedure not generally available, but determined medically necessary by the CMA, such as medications and clinical trials. The administration of such investigational therapies shall follow relevant FDA or other national protocols and will be administered only with written consent from the detainee, which should be retained in the detainee's medical record. The facility shall notify ICE/ERO of all such situations.

### S. **Mental Health Program**

#### 1. **Details**

The facility shall have a mental health program, approved by the appropriate medical authority, that provides:

a.  Assistance with intake screening for mental health concerns;

b.  Referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a qualified mental health care provider;

c.  Sufficient capacity to provide crisis intervention and management of acute mental health episodes;

d.  Transfer to licensed mental health facilities of detainees whose mental health needs exceed the capabilities of the facility; and

e.  Professional consultation for and assistance with the suicide prevention program.

#### 2. **Referrals and Treatment**

Based on the intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, a detainee may be referred for mental health treatment or evaluation. Any detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than seven days after the referral. The provider shall develop an overall treatment/management plan. If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility shall be initiated and the facility shall notify ICE/ERO in a timely manner. Any detainee prescribed psychiatric medications must be regularly evaluated by a duly licensed and appropriate medical professional to ensure proper treatment and dosage.

#### 3. **Involuntary Administration of Psychotropic Medication**

Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written, and detailed authorization of a physician. Absent a declared medical emergency, before psychotropic medication is involuntarily administered, the HSA shall contact ICE/ERO to facilitate a request for a court order.

#### 4. **Serious Mental Illness**

The following non-exhaustive categories of conditions should be considered to constitute a serious mental illness:

a. conditions that a qualified medical provider has determined to meet the criteria for a "serious mental disorder or condition" pursuant to applicable ICE policies, including:

1) A mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g., communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g., traumatic brain injury or dementia) that is significantly impairing mental function; or

2) One or more of the following active psychiatric symptoms and/or behaviors: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity; or

3) Significant symptoms of one of the following:

    i.    Psychosis or Psychotic Disorder;

    ii.    Bipolar Disorder;

    iii.    Schizophrenia or Schizoaffective Disorder;

    iv.    Major Depressive Disorder with Psychotic Features;

    v.    Dementia and/or a Neurocognitive Disorder; or

    vi.    Intellectual Development Disorder (moderate, severe, or profound);

4) Any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

5) Any condition that would preclude the detainee from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic); and

6) Any other mental illness determined to be serious by IHSC.

## T. Referrals for Sexual Abuse Victims or Abusers

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical

practitioner or mental health provider for a medical and/or mental health evaluation and follow-up as appropriate.

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a "qualified medical practitioner" or "qualified mental health practitioner" means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his or her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## U.  **Women's Medical Care**

Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community and clinical guidelines for women's health services.

### 1.  **Initial Assessment**

All initial health assessments of female detainees shall be conducted by a qualified health care practitioner. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about and perform the following:

a.  Pregnancy test for detainees aged 18-56 and deliver to the detainee and document the results;

b.  If the detainee is currently nursing (breastfeeding);

c.  Use of contraception;

d.  Reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

e.  Menstrual cycle;

f.  History of breast and gynecological problems;

g.  Family history of breast and gynecological problems; and

h.  Any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by a health care practitioner.

## 2. Preventive Services

Contraception

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

## 3. Pregnancy

Upon confirmation by health care practitioner that a detainee is pregnant, the detainee shall be provided close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling on topics including, but not limited to, nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parenting skills.

The facility administrator shall ensure that ICE/ERO is notified as soon as practicable of any pregnant detainee, but no later than 72 hours after such determination.

A health care practitioner will identify any special needs (e.g., diet, housing, and other accommodations such as the provision of additional pillows) and inform all necessary security staff and facility authorities. If a pregnant detainee has been identified as high risk, the detainee shall be referred to a physician specializing in high risk pregnancies.

All chemically dependent pregnant detainees (e.g., detainees dependent on substances including alcohol, sedatives/hypnotics, anxiolytics, and opioids) are considered high risk and referred to qualified physician capable of addressing their needs immediately.

a. <u>Abortion Access</u>

In the event continued detention is necessary and appropriate, and consistent with the practice of ICE/ERO's federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE/ERO will assume the costs associated with a female detainee's decision to terminate a pregnancy.

1) In this instance, or in a situation where a female detainee opts to fund the termination of her pregnancy, ICE/ERO will arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial)

medical resources and social counseling, to include outside social services or women's community resources groups.

2) If a detainee requests to terminate her pregnancy, it will be documented in the detainee's medical records. The detainee's statement should be signed personally by the detainee and include clear language of the detainee's intent.